UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 4:10-cr-31 |
| ) | *Mattice/Carter* |
| KENNETH CLAY ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant seeks to suppress evidence found in his house following the execution of a search warrant on May 2, 2010 (Doc. 11). The motion has been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Defendant argues that much of the information in the affidavit used to obtain the search warrant was illegally obtained and, absent that information, the affidavit fails to support probable cause to issue the search warrant. Even with the suspect information excised from the affidavit, the affidavit still supports issuance of the search warrant. Therefore, it is RECOMMENDED the defendant's motion to suppress be DENIED.[1]

II. Relevant Facts

A. November 10, 2010 Evidentiary Hearing

The undersigned held an evidentiary hearing on Defendant's motion to suppress on Wednesday, November 10, 2010. During that hearing, Sheriff Brent Myers of Grundy County

---

[1]The undersigned entered a report and recommendation on December 16, 2010 [Doc. 16] on this motion to suppress but vacated the report and recommendation after defendant filed a motion to reopen the evidence to supplement with new, previously unavailable evidence. [Doc. 17]. This has been done, and this report and recommendation considers the new evidence.

1

and Grundy County Sheriff's Deputy James Cox testified. Steven Turmin, an investigator with the Federal Defender Services of Eastern Tennessee, Inc., also testified. Based on their testimony I make the following findings:

Sheriff Myers has twenty years of experience in law enforcement. He has been to the FBI academy in Quantico, Virginia to receive training on methamphetamine labs and has investigated over three hundred illegal methamphetamine labs during his twenty year career. Deputy Cox has been employed with the Grundy County Sheriff's Department since December 9, 2007. Deputy Cox has not received formal training regarding methamphetamine labs, but he has found a few methamphetamine labs and participated in investigating them.

On May 1, 2010, Sheriff Myers arrived at a house fire on Highway 41 in Pelham, Tennessee. It was approximately 8 pm and already dark. Fire units were present. Deputy Cox and other investigators were also present and had begun an investigation. A gas jug still containing some gas was found on the premises, and arson was suspected. The homeowner of the burning house told Sheriff Myers that he had been involved in an altercation with the defendant the day before, and the defendant had threatened him. The homeowner also told investigators the defendant had been firing a gun in defendant's yard the same day they had argued.

Sheriff Myers spoke with neighbors at the scene. One neighbor who lives in the area behind the burning house stated that he saw two males run from the residence in the direction of the defendant's home at about the time the fire started. The defendant's house was the second door down from the burning house on the same side of the street. The area is a rural, residential area. Each house on the street sits on a half acre lot with 200-300 feet between the houses.

The area was not well lit, but Sheriff Myers and Deputy James Cox began to canvass the yard of the burning home with flashlights. They followed tracks in the dew leading straight through the adjoining neighbor's front yard into defendant's front yard. Mr. Clay's front yard was not fenced. There were some bushes along the property line, but the bushes did not form an enclosure or complete hedge. Once on defendant's property, Sheriff Myers and Deputy Cox went up the walk in the middle of the yard to the defendant's front stoop. While Deputy Cox went around to the back of the house, Sheriff Myers stepped up on the concrete stoop in front of the house. From the stoop, he could see on his left as he faced the front door, about eight feet away, a fiberglass bathtub sitting in the front yard. Shining his flashlight into the tub, he saw an open black garbage bag that appeared to be smoking. A smell he recognized as hydrochloric gas, a gas he knew was used in methamphetamine manufacturing, emanated from the bag. In the bag he saw what appeared to be an improvised hydrochloric generator, *i.e.*, a plastic bottle containing acid with a hole at the top and vinyl tubing extruding from it. He also saw coffee filters. Myers knew from his training that both coffee filters and a hydrochloric generator are used to manufacture methamphetamine.

Sheriff Myers then approached the front door. There was a window to the left side of the door, and the door itself was cracked open. When he looked into the window, Sheriff Myers saw the defendant lying on the couch. His clothing and hands were black. Sheriff Myers knocked on the door causing it to open a little wider.

Sheriff Myers then made the decision to enter the house without a warrant. First, he was concerned about his and his deputy's safety. He intended to seize the incriminating items in the bathtub, he knew the defendant had been shooting his gun the day before, and he did not want to

be a target from the house. Second, based on the items in the yard, he believed the defendant was or had just been cooking methamphetamine, and he knew from his training and experience that a methamphetamine lab can explode at any time. Sheriff Myers also believed he had probable cause to arrest the defendant for manufacturing methamphetamine. Once inside the house, he attempted to speak with the defendant, but the defendant became very belligerent. Therefore, Sheriff Myers arrested him. Inside the house Sheriff Myers could see other items indicative of methamphetamine manufacturing and use in plain view; namely, scales, needles, and spoons with a white residue. He left the house with the defendant and did not seize any items in the house at that time.

While Sheriff Myers had been in the front of the house, Deputy Cox was in the backyard where he observed a burn pile. He saw lithium batteries and lithium strips, which he knew to be used in the manufacture of methamphetamine, in the burn pile. Cox informed Myers about these items. Sheriff Myers immediately left the scene to prepare an affidavit and secure a search warrant. Sheriff Myers executed the warrant in the early morning hours of May 2, 2010 and found numerous components of a methamphetamine laboratory in defendant's home.

### B. Search Warrant Affidavit

In the affidavit Sheriff Myers prepared to obtain the search warrant for defendant's house, Myers set out the training and experience he has had in investigating methamphetamine manufacturing. He also stated in relevant part:

> On the 02 day of May 2010, I Sheriff Brent Myers and Investigator Jaimie Cox was [sic] investigating a possible arson that happened at the Chris Rogers residence located on Highway 41 in Pelham, Tennessee. The fire was reported at 8:31 p.m. to E-911 on 5-1-10. Our investigation led us to a possible suspect. The suspect was the defendant, Kenneth Ray Clay. Mr. Clay lived two houses down

> on the same side of the road as the fire. There were tracks in the dew on the
> ground that led us to Mr. Clay's residence. As we approached the residence we
> noticed a fiberglass tub in the yard. We could see drug paraphernalia in the tub
> that is commonly used in the manufacture of methamphetamine. We saw used
> coffee filters, tubing, bottles with acid, home made hydrochloric acid gas
> generators and lithium battery strips. We also saw a burn pile in the yard that
> contained burned paraphernalia that is commonly used in the manufacture of
> methamphetamine. We could also smell a strong chemical odor that is commonly
> encountered at scenes where methamphetamine is being illegally manufactured.
> We could smell a strong acid smell.

(Myers Aff. at pp. 2-3, Gov. Collective Ex. 1 to Nov. 10, 2010 hearing).

The affidavit further provided the following information:

> Myers received information about defendant firing his gun in his yard the day
> before and that defendant had been convicted for possession of a schedule II
> controlled substance and reckless endangerment involving a deadly weapon.
> Myers was concerned he might be shot by the defendant while seizing the
> incriminating items in the yard. The front door was cracked open so he pushed it
> open and attempted to talk to defendant who became very belligerent. Myers then
> put defendant under arrest for manufacturing methamphetamine. Myers also saw
> scales, needles, and spoons with a white powder residue inside the residence.

(Myers Aff., Gov. Collective Ex. 1 to Nov. 10, 2010 hearing).

### C. Supplemental Evidence

Following the November 10, 2010 hearing, the defendant supplemented the evidence with additional photographs taken by police at the scene of the defendant's home on May 2, 2010. These photographs had not been made available to the defendant at the November 10, 2010 hearing. Of particular note were photographs of the black plastic garage bag inside the bathtub in the defendant's yard. The photographs show that the tie at the top of the garbage bag appears to be tied closed and the side of the plastic garbage bag is torn open to reveal its

5

contents.[2]  While the quality of the photographs are not particularly good, the undersigned can see the plastic soda bottle and tubing.

III. Analysis

A.  Tainted and Untainted Information in the Affidavit

Defendant argues Sheriff Myers' affidavit does not provide probable cause to search his home because much of the evidence in the affidavit was obtained illegally and the remaining information in the affidavit is insufficient to support probable cause.

*1. The Items Observed in the Defendant's House*

Defendant argues that the information concerning what Sheriff Myers saw in defendant's house when he entered to arrest defendant was illegally obtained because Sheriff Myers had no warrant or valid exception to the warrant requirement to enter the house.  The affidavit indicates that when Sheriff Myers entered the defendant's house, he saw scales, needles, and spoons with a white residue.  Assuming *arguendo* that this information was illegally obtained, the affidavit is still sufficient to support probable cause to issue the search warrant for defendant's house based on the untainted information in the affidavit.  I will therefore examine the affidavit without considering the scales, needles, and spoons with a white residue seen in the house.  *See United States v. Jenkins*, 396 F.3d 751, 758-60 (6th Cir. 2005) (illegally obtained information should be excised from an affidavit for purposes of determining whether untainted information in the affidavit supports probable cause to issue the search warrant), *accord United States v.*

---

[2] The purpose of allowing additional briefing after the introduction of the supplemental evidence was to give the defendant the opportunity to address the new evidence.  However, defendant does not restrict his supplemental brief to the new evidence, instead raising new arguments about evidence which was presented at the November 10, 2010 suppression hearing.

6

*Shamaeizdeh*, 80 F.3d 1131, 1136 (6th Cir. 1996); *United States v. Caldwell*, 2000 WL 875694 *2 (6th Cir. Jun. 19, 2000).

### *2. The Items in the Bathtub and the Strong Chemical Odor*

The affidavit itself indicates that in the course of investigating a suspected case of arson, Sheriff Myers and Deputy Cox followed tracks in the dew leading from the burning house to the defendant's house. According to the affidavit, as they approached the defendant's house, they saw in plain view in the defendant's yard a fiberglass bathtub which contained items commonly used to manufacture methamphetamine: used coffee filters, tubing, bottles with acid, [and] home made hydrochloric gas generators...."[3] The affidavit also states Sheriff Myers smelled "a strong chemical odor commonly encountered at scenes where methamphetamine is being illegally manufactured." The affidavit further detailed Sheriff Myers' extensive training concerning methamphetamine laboratories, methamphetamine precursors, and manufacturing methods.

Defendant admits that "[i]n conducting their [arson] investigation, officers would be allowed to follow such footprints [in the dew] if they existed, and go to Mr. Clay's front door to interview him." (Defendant's Motion to Suppress at 3, Doc. 11). Defendant argues, however, that the officers' testimony that they were following tracks in the dew to the defendant's home is not credible because when Sheriff Myers reached the house, only one person, as opposed to two, was there. It is not necessary for Sheriff Myers to explain what happened to the second man. Perhaps he reached the defendant's house and later left. Defendant has offered only conjecture,

---

[3] The affidavit also indicates that lithium battery strips were seen in the bathtub; however, at the November 10, 2010 suppression hearing, Deputy Cox testified the lithium battery strips were seen in a burn pile in the back of the yard. Out of an abundance of caution, I will not consider any items except those seen in the front yard when the officers approached the defendant's house.

and there is no testimony to contradict Cox's and Myers' testimony. Further, I find Sheriff Myers and Deputy Cox to be credible witnesses. I conclude, based on the evidence presented at the November 10, 2010 evidentiary hearing, that in the course of investigating a suspected arson, Sheriff Myers and Deputy Cox were following tracks through the dew which led to defendant's house.

In addition, a police officer may, without reasonable suspicion or probable cause, approach the front door to a residence to knock and ask questions provided the resident has not attempted to block access to the front door or taken other significant measures, such as "No Trespassing" signs, to maintain his privacy. *See Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006); *see also* 60 A.L.R.5th 1, § 3 ("Generally, areas of the curtilage impliedly open to the public include the driveway, walkway, or access route leading to the residence, but if a portion of the driveway is hidden from public view and does not lead directly to the house, it may fall outside the impliedly open areas of the curtilage; the guiding principle is that a police officer on legitimate business may go where any 'reasonably respectful citizen' may go."); *see also*, *United States v. Ventling*, 678 F.2d 63 (8th Cir. 1982) (officer observed and photographed tire tracks after driving into driveway); *United States v. Humphries*, 636 F.2d 1172 (9th Cir. 1980) (officer observed parked car in open view from street and entered driveway to get license number). "Public drives, sidewalks, or walkways (even those which lead to a rear side door) are not within the curtilage of the home when they are not enclosed by a gate or fence." *United States v. French*, 291 F.3d 945, 953 (7th Cir. 2002); (*citing United States v. Evans*, 27 F.3d 1219 (7th Cir.1994)); *United States v. Titemore,* 335 F. Supp. 2d 502, 505 (D. Vt. 2004) ("Under the rule permitting knock and talk visits, no Fourth Amendment search occurs when police officers who

enter private property restrict their movements to those areas generally made accessible to visitors.") (quotation omitted). *Zain v. Zahradnicek,* 2010 WL 3221887 *4 (Aug. 13, 2010) ("Police do not violate the Fourth Amendment simply by approaching the entry to a person's dwelling place, knocking, and asking to talk.")

In the instant case, the defendant had made no effort to shield the front yard from public view. There were no physical or visual barriers from the street in front of the house or on the sides of the yard next to the adjoining properties. As previously stated, there were a few bushes along the property line in between the defendant's lot and his neighbor's lot, but these bushes were sporadically placed and did not form a privacy screen or hedge. There were no "No Trespassing" signs. Once on the property, Sheriff Myers walked up the defendant's walkway intending to knock on the door and talk to the defendant. I conclude he was permissibly on defendant's property when he saw the bathtub in the yard and smelled the strong odor of a methamphetamine cook.

Next, defendant challenges Sheriff Myers' contention that the plastic garbage bag in the bathtub was open to allow him to see some of its contents in plain view. Defendant argues Sheriff Myers must have torn open the bag himself to reveal the contents. The undersigned, however, finds Sheriff Myers to be a credible witness, and he testified that he could see inside the bag by shining the flashlight into the tub, and, without manipulating the bag at all, he could see a plastic bottle with tubing and used coffee filters indicative of methamphetamine manufacturing. I find Sheriff Myers credible. I do not conclude Sheriff Myers tore open the bag before he knocked on the defendant's door. He saw the bag "laid open" and could see the bottle with tubing and the used coffee filters. It is not Sheriff Myers' responsibility to explain how the bag

9

came to be torn if he testifies credibly that he did not tear it. It is certainly possible that the defendant may have torn it himself to retrieve something he had thought he no longer needed but then changed his mind. Having found Sheriff Myers credible, I conclude the evidence of the plastic bottle with the tubing and the coffee filters, which Myers recognized immediately as components of a methamphetamine lab, were obtained legally pursuant to the plain view doctrine. *See Horton v. California*, 496 U.S. 128, 134-35 (1990) (the plain view doctrine permits warrantless seizures of property where: (1) the officer was lawfully in a position from which the object was plainly seen; (2) the object was in plain view; (3) the object's incriminating nature was immediately apparent; and (4) the officer had a lawful right of access to the object.)

### *B. The Sufficiency of the Affidavit with the Allegedly Tainted Information Redacted*

Having concluded the information of the bathtub items in the yard and the strong chemical odor were obtained legally, the undersigned shall examine whether these items, as well as other information not alleged to be tainted, are sufficient to establish probable cause to search defendant's house.

The Fourth Amendment prohibits unreasonable searches and seizures providing "no warrant shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend IV*. To establish probable cause to justify a search warrant, an affidavit must set forth facts which indicate "a fair probability exists that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal citations omitted); *see also United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009). The

Court must consider the totality of the circumstances as set out in the four corners of the affidavit. *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (totality of the circumstances standard).

Defendant contends there is insufficient nexus between the items in the bathtub and the strong chemical odor and the defendant's house to justify the search warrant. The bathtub was in the defendant's yard where the smell of methamphetamine manufacturing was strong and Sheriff Myers knew the defendant had been convicted for possession of a schedule II controlled substance. The reasonable inference is that the materials in the bathtub were recently used to manufacture methamphetamine and most likely came from the house situated in the same yard as the bathtub – *i.e.* the defendant's yard. The information presented in the affidavit need not provide iron clad proof that evidence of a crime will be found in the place to be searched; it need only show a "fair probability." The affidavit in the instant case does so, and I conclude it is sufficient to support probable cause to issue the search warrant for defendant's residence.

IV. Conclusion

For the reasons stated herein, it is RECOMMENDED defendant's motion to suppress be DENIED.[4]

                                      *s/William B. Mitchell Carter*
                                      UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).